UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JEANETTE LLAURADOR-PEREZ and GRISEL ESMURRIA,<br>    *Plaintiffs*,<br>    v.<br>CLEAN COUNTRY CARS, Inc. and INDUSTRIAL ACCEPTANCE CO., LP,<br>    *Defendants*. | Civil No. 3:13cv1333 (JBA)<br><br>November 5, 2014 |

**RULING GRANTING PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT AS TO CLEAN COUNTRY CARS**

Plaintiffs brought this suit alleging violations of federal and state consumer protection laws against Defendants Clean Country Cars ("CCC") and Industrial Acceptance Co., LP ("IAC"). Specifically, as to CCC, Plaintiffs assert violations of the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, as well as breach of warranty.[1] (Compl. [Doc. # 1] ¶ 1.) CCC filed its Answer on December 9, 2013, but on July 14, 2014, counsel for CCC moved [Doc. # 39] to withdraw as CCC's attorney. The Court subsequently notified [Doc. # 41] CCC that a replacement appearance must be filed by September 3, 2014. On September 9, 2014, CCC's attorney's motion to withdraw was granted [Doc. # 47]. When no replacement appearance was filed on behalf of CCC, Plaintiffs moved [Doc. # 44] for, and the Court granted [Doc. # 48] entry of default

---

[1] Plaintiffs allege that IAC is liable as assignee of their retail installment contract ("Contract") (Hewitt Dep., Ex. 2 to Mem. Supp. Mot. for J. [Doc. # 52-1]) for their breach of warranty claims, as well as for their CUTPA and CCPA claims and attorney's fees. (Mem. Supp. Mot. for J. at 8.)

against CCC.  Plaintiffs now move [Doc. # 52] for default judgment against CCC.  For the following reasons, Plaintiffs' motion is granted.

I.      **Legal Standard**

Federal Rule of Civil Procedure 55 "provides a two-step process for obtaining a default judgment[:]"

> The first step is to obtain a default. When a party against whom affirmative relief is sought has failed to plead or otherwise defend, a plaintiff may bring that fact to the court's attention, and Rule 55(a) empowers the clerk of the court to enter a default against a party that has not appeared or defended.

*New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005).  The entry of a default under Rule 55(a) constitutes an admission by the defaulting party of the well-pleaded factual allegations in the complaint except claims for damages.  *See Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981).  The Court must then "'consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit conclusions of law.'" *Johnson & Johnson v. Azam Int'l Trading*, No. 07-CV-4302 (SLT) (SMG), 2013 WL 4048295 at *8 (E.D.N.Y. Aug. 9, 2013) (quoting *Labarbera v. ASTC Labs., Inc.*, 752 F. Supp. 2d 263, 270 (E.D.N.Y. 2010)).  Entry of a default judgment under Rule 55(b) establishes a defaulting party's liability, and a final judgment that terminates the litigation as to that party is entered, awarding the movant relief to which the court decides it is entitled as permitted by Rule 54(c).[2]

---

[2] Under Fed. R. Civ. P. 54(c), "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."

II.     Discussion

A. **Elements of the Claims**

Plaintiffs allege that CCC violated TILA and breached explicit and implicit warranties. Under TILA:

> For each consumer credit transaction other than under an open end credit plan, the creditor shall disclose each of the following items, to the extent applicable: . . .
>
> (2)(A) The "amount financed", using that term, which shall be the amount of credit of which the consumer has actual use. . . ."
> (3) The "finance charge", not itemized, using that term.
> (4) The finance charge expressed as an "annual percentage rate", using that term. . . ."

15 U.S.C. § 1638(a). The regulations define the "finance charge" as: "the cost of consumer credit as a dollar amount[,]. . . include[ing] any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit [and excluding] any charge of a type payable in a comparable cash transaction." 12 C.F.R. § 226.4(a). According to Plaintiffs, because CCC inflated the cash price to deceive IAC into believing the car was worth more, Plaintiffs were subject to a higher sales tax than they would have been subject to had they paid in cash.[3] (Mem. Supp. Mot. for J. at 6.) As such, the extra $95.25 Plaintiffs paid in sales taxes due to the inflated price was a "finance charge" as defined by the regulations and CCC was required to disclose it. (*Id.*) In addition, Plaintiffs allege that CCC violated

---

[3] IAC would not have been a party of the transaction had Plaintiffs paid in cash, and without IAC, CCC would have had no incentive to inflate the price.

TILA by disclosing an inaccurate "amount financed" (by inflating the cash price and the down payment Plaintiffs supposedly paid).  (*Id.* at 5.)

Plaintiffs next contend that CCC breached an express warranty that the Vehicle would be "mechanically operational and sound" and the implied warranty of merchantability under C.G.S. § 42a-2-314.  Under C.G.S. § 42a-2-213,

> (1) Express warranties by the seller are created as follows: (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise. . . .
>
> (2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

C.G.S. § 42a-2-314 provides:

> (1) Unless excluded or modified . . . a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . .
>
> (2) Goods to be merchantable must be at least such as (a) pass without objection in the trade under the contract description; . . . and (c) are fit for the ordinary purposes for which such goods are used. . . .

Plaintiffs seek a refund of the amount they paid for the Vehicle, as provided for under C.G.S. § 42a-2-711(1)[4] as well as consequential damages (in the amount of their insurance payments) under C.G.S. § 42a-2-715[5] because they allege that they validly and effectively revoked their acceptance of the Vehicle. (Mem. Supp. Mot. for J. at 7.) Under C.G.S. § 42a-2-608:

> (1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it (a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or (b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.
> (2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.
>
> (3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

---

[4] C.G.S. § 42a-2-711(1) states: "Where the . . . buyer . . . justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract, . . . the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid (a) 'cover' and have damages under the next section as to all the goods affected whether or not they have been identified to the contract; or (b) recover damages for nondelivery as provided in section 42a-2-713."

[5] C.G.S. § 42a-2-715(2) states: "Consequential damages resulting from the seller's breach include (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and (b) injury to person or property proximately resulting from any breach of warranty."

## B. Factual Allegations

By entry of default, the following facts are deemed admitted as to CCC:

"In or around April 15, 2013, Plaintiffs visited CCC to inquire about purchasing a minivan." (Compl. ¶ 10.) "Upon arriving at CCC, Plaintiffs met with a CCC representative who identified himself as Fran Hewitt." (*Id.* ¶ 11.) "Hewitt showed Plaintiffs the Vehicle and told them that the Vehicle was a good van and that it ran well." (*Id.* ¶ 12.) "The price on the Vehicle was $5,695." (*Id.* ¶ 13.) "Plaintiffs, who did not have experience purchasing a Vehicle at a dealership before, did not test drive the vehicle at this time. Rather, Hewitt started the Vehicle for them and they examined it on CCC's lot." (*Id.* ¶ 15.) "Following Plaintiffs' viewing of the Vehicle, Hewitt asked Plaintiffs to fill out credit applications." (*Id.* ¶ 16.) "Llaurador-Perez told Hewitt that she did not want to pay more than $7,000, including the finance charge." (*Id.* ¶ 17.) "Hewitt told Plaintiffs that CCC required a down payment of $500." (*Id.* ¶ 18.) "After Plaintiffs paid the $500 deposit, they took the Vehicle home pursuant to a Temporary Loan of Motor Vehicle Agreement." (*Id.* ¶ 19.)

"While driving the Vehicle, Llaurador-Perez observed that the Vehicle was displaying signs of transmission problems and was shaking as she accelerated and while going uphill. Llaurador-Perez also observed that the sunroof worked intermittently, that the power doors did not consistently open and that the power locks did not consistently work." (*Id.* ¶ 20.) "On or around April 18, 2013, Plaintiffs returned to CCC and spoke with Hewitt." (*Id.* ¶ 21.) "Llaurador-Perez informed Hewitt of the problems she experienced with the Vehicle." (*Id.* ¶ 22.) "Hewitt responded that CCC would repair all of these problems at no charge to Plaintiffs and that CCC would provide Plaintiff with

loaner vehicles during repairs." (*Id.* ¶ 23.) "Based on the representations of Hewitt . . . Plaintiffs decided to purchase the Vehicle." (*Id.* ¶ 24.)

"Hewitt presented Plaintiff with the Contract and Llaurador-Perez observed that it indicated a down payment of $2,000, even though she had paid only $500." (*Id.* ¶ 25.) "When Llaurador-Perez questioned Hewitt about the down payment, he falsely responded that Plaintiffs had received a special discount." (*Id.* ¶ 26.) "[T]he cash price of the vehicle was inflated by $2,000; effectively negating the alleged 'discount.'" (*Id.* ¶ 27.) "[T]he Contract contained an unidentified fee of $795 payable to IAC." (*Id.* ¶ 28.) "The Vehicle was sold to Plaintiffs with a limited warranty that provided that CCC guaranteed the Vehicle to be mechanically operational and sound for 60 days or 3,000 miles and that it would pay 100 percent of all parts and labor within the warranty period." (*Id.* ¶ 31.)

"Shortly after taking delivery of the Vehicle, Plaintiffs began to experience the same problems with the Vehicle as they had prior to purchase." (*Id.* ¶ 32.) "Llaurador-Perez returned to CCC with the Vehicle on April 26, 2013 on which day CCC performed repairs to the Vehicle." (*Id.* ¶ 33.) "CCC failed to adequately repair the Vehicle." (*Id.* ¶ 34.) "On or around May 30, 2013, Llaurador-Perez advised IAC that Plaintiffs wished to revoke acceptance of the Vehicle due to its defective condition. IAC responded that it would notify CCC." (*Id.* ¶ 35.) "When Llaurador-Perez returned to CCC, she was confronted by Hewitt." (*Id.* ¶ 36.) "Hewitt . . . stated that Llaurador-Perez would ruin her credit if she revoked acceptance and that she should reconsider her decision." (*Id.* ¶ 37.) "Llaurador-Perez left the Vehicle at CCC, removed the license plates and left CCC. However, later that day, due to the representations of Hewitt, Llaurador-Perez contacted CCC and stated that she would allow CCC another opportunity to repair the Vehicle."

(*Id.* ¶ 38.)  "Hewitt responded that CCC would repair the Vehicle and that it would be ready in a week or two." (*Id.* ¶ 39.)

"After a week, the Vehicle was still not ready and Llaurador-Perez spoke with Hewitt and requested that he allow her to revoke acceptance of the Vehicle." (*Id.* ¶ 40.) "Hewitt provided Llaurador-Perez with a letter acknowledging her revocation of acceptance." (*Id.* ¶ 41.)  Based on a conversation with a representative of IAC, "Llaurador-Perez elected not to revoke her acceptance." (*Id.* ¶ 43.)  "Eventually, Llaurador-Perez was informed that the Vehicle was ready for pickup on July 17, 2013." (*Id.* ¶ 44.) "When Llaurador-Perez arrived at the dealership on July 17, she was informed by a mechanic that she should not take the Vehicle on a planned trip to New York City because the Vehicle was leaking transmission fluid." (*Id.* ¶ 45.) "When Llaurador-Perez confronted Hewitt regarding the leak, he told her that the mechanic would stay overtime to repair the leak and that she should return to pick up the Vehicle the following day." (*Id.* ¶ 46.)

"The following day, Llaurador-Perez returned to pick up the Vehicle. (*Id.* ¶ 47.) CCC affixed dealer license plates to the Vehicle so that it could be driven, and Plaintiff left with the Vehicle to New York City." (*Id.* ¶ 48.)  "Roughly 20 miles away from the dealership, the Vehicle began to shake and smoke. Llaurador-Perez contacted Hewitt and informed him of the problem." (*Id.* ¶ 49.) "CCC provided Llaurador-Perez with a loaner van and took the Vehicle back to CCC." (*Id.* ¶ 50.) "On or around August 5, 2013, Plaintiffs, through their attorneys, provided IAC and CCC with written notice of Plaintiffs' revocation of acceptance." (*Id.* ¶ 51.)

These factual allegations are sufficient to state a claim for violations of 15 U.S.C. § 1638(a)(2A), (3), and (4) (failure to accurately and truthfully disclose the amount financed and finance charge), and for breach of warranty.

**C.  Damages**

Where "plaintiffs have filed reasonably detailed declarations and exhibits pertaining to the damages incurred, and where the defendant has failed to make an appearance in the case, the Court can make an informed [decision] regarding damages without an evidentiary hearing." *La Barbera v. Fed. Metal & Glass Corp.*, 666 F. Supp. 2d 341, 349 (E.D.N.Y. 2009).  Plaintiffs here have made sufficiently detailed declarations to permit the Court to determine damages without a hearing.

Plaintiff seeks the following damages: (1) for breach of warranty, actual damages of $1,603.85 ($500 down payment, $725.85 installment payments made under contract, and $378 in insurance payments); (2) for TILA violations, $95.25[6] in actual damages and $2000 in statutory damages applicable to the $1509 finance charge reflected in the contract.[7]

---

[6] This is the excess sales tax Plaintiffs allege they paid due to CCC's misrepresentation of the price of the Vehicle.

[7] Under 15 U.S.C. § 1640(a)(2)(A)(i) and (ii), statutory damages for violations are equal to "twice the amount of any finance charge in connection with the transaction," but may not exceed $2,000.

### III.     Conclusion

Because Plaintiffs have put forth sufficient factual allegations to state a claim for violations of 15 U.S.C. § 1638(a)(2A), (3), and (4), and for breach of warranty, and because CCC has failed to oppose the motion for default judgment, Plaintiffs' Motion [Doc. # 52] for Default Judgment as to CCC is GRANTED.  Judgment by default in the amount of $3,669.10 is entered against Defendant CCC.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 5th day of November, 2014.